# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**KELLY ANN ISEMAN,**                              Case No. 1:19 CV 2806

    Plaintiff,                                   Judge Solomon Oliver, Jr.

    v.                                           Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                   **REPORT AND RECOMMENDATION**

## INTRODUCTION

Plaintiff Kelly Ann Iseman ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated December 2, 2019). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be reversed and remanded for further consideration of the treating psychiatrist's opinions.

## PROCEDURAL BACKGROUND

Plaintiff originally filed applications for DIB and SSI in 2012 (Tr. 217-53), alleging disability onset dates of January 1, 2011 (Tr. 228) and February 28, 2011 (Tr. 219, 248). Plaintiff pursued this claim through the administrative process and on June 4, 2014, an administrative law judge ("ALJ") found Plaintiff not disabled. (Tr. 12-32). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-

5); 20 C.F.R. §§ 404.955, 404.981. Plaintiff appealed this decision, and this Court reversed and remanded the ALJ's decision on September 21, 2016, finding the ALJ erred in the consideration of treating physician Dr. Hanahan's opinion. (Tr. 897-921); *Iseman v. Comm'r of Soc. Sec.*, No. 15cv1571 (N.D. Ohio). The Appeals Council then remanded the case to the ALJ on November 25, 2016. (Tr. 889-93).[1] The ALJ held a second hearing on July 13, 2017, at which Plaintiff (represented by counsel) and a VE again testified. (Tr. 741-804). On December 5, 2018, the ALJ issued a written decision again finding Plaintiff not disabled. (Tr. 633-44). The Appeals Council denied Plaintiff's request for review. (Tr. 621-27). Plaintiff then timely filed the instant case on December 2, 2019. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Born in October 1968, Plaintiff was 44 years old at the time of the first ALJ hearing and 47 years old when last insured for benefits in June 2016. *See* Tr. 40-41, 219. She has a high school education and one year of online college. (Tr. 42).

*First ALJ Hearing – August 2013*

Plaintiff testified to shooting pain from her neck down her left arm; her left hand was often numb. (Tr. 43-44). She also had low back pain (Tr. 48). Pain medication and a muscle relaxer did not eliminate her pain, but only took the edge off. (Tr. 44-45, 49).

Plaintiff cooked, washed some dishes, dusted and swept; she did not mop, vacuum, or do laundry (but helped fold it). (Tr. 57, 60). She went to the grocery store and to church on Sunday;

---

1. Therein, the Appeals Council noted that Plaintiff filed subsequent applications for DIB and SSI in February 2016 and that its action "renders the subsequent claims duplicate or causes them to involve an overlapping period of time." (Tr. 891). Therefore, the Appeals Council ordered the ALJ to "consolidate the claims, create a single electronic record and issue a new decision on the consolidated claims", in addition to holding a new hearing. *Id.*

she read, cared for her cat, and picked up around the house. (Tr. 58-59). She could not fasten buttons (Tr. 46) or pick up a coin off a table (Tr. 47) and used her right hand to wash her hair (Tr. 61). She used a computer occasionally, but could only type for a few minutes before her left fingers became numb. *Id.* Plaintiff dropped eating utensils once or twice during a meal. (Tr. 62).

Plaintiff drove approximately twice per week, but had difficulty because moving her right leg caused "pain shooting up [her] spine" from her lower back. (Tr. 41-42). She left the house four to five times per week: "[t]o the doctors and we try to hit the shopping mall" (Tr. 51), and went to therapy approximately three times per week by herself (Tr. 59).

Plaintiff estimated she could lift eight to ten pounds, walk 100 yards, stand for five minutes, and sit for ten to fifteen minutes. (Tr. 51-53).

Plaintiff also had bipolar disorder. (Tr. 53). She had ups and downs daily; medication "kind of help[ed]." (Tr. 54). Plaintiff also had anxiety, more so outside the home. (Tr. 54-55). When she was working, she did not have trouble interacting with others. (Tr. 77-78). She tended to feel depressed before bed. (Tr. 55). She had recently started a new medication because she was hearing voices, and it helped. (Tr. 62). Plaintiff was hospitalized in 2010 or 2011 for psychiatric problems. (Tr. 64).

*Second ALJ Hearing – July 2017*

Plaintiff testified she drove a couple times per week to doctor appointments; she grocery shopped with her son and he drove. (Tr. 749, 757-58). She lived with her son and five-year-old grandson. (Tr. 757). Plaintiff wore a left knee brace due to arthritis; she had surgery the prior fall. (Tr. 754). Plaintiff testified to back pain from her lower back to her neck. (Tr. 754-55). Her lower back pain occasionally caused sciatic nerve irritation, which lasted anywhere from one hour to three days. (Tr. 755). Plaintiff had pain in her upper back and neck from deteriorating

3

discs; the pain traveled down her left arm causing it to go numb. (Tr. 756). She could use a computer for fifteen minutes. (Tr. 756-57). She could lift a gallon of milk, but not a ten-pound bag of potatoes; she lifted with her right hand because she sometimes dropped things with her left hand. (Tr. 758-59). She dropped things approximately once per day. (Tr. 759). She also had difficulty picking up small objects, buttoning, and writing. *Id.* Her left hand was numb "all the time." (Tr. 777).

Plaintiff took prescription Advil for her pain, which reduced her pain from a seven out of ten to a five out of ten. (Tr. 780).

Plaintiff saw a psychiatrist – Dr. Svete – at Signature Health; a counselor also came to her home weekly. (Tr. 760). Plaintiff had visual and auditory hallucinations – she saw shadows and heard "background noise" and voices telling her she was "no good", "useless", or to "[g]ive up". (Tr. 760-61). She took Lexapro, BuSpar, and Lamictal for her mental health symptoms. (Tr. 781-82). Lamictal lessened, but did not eliminate, her hallucinations. (Tr. 782).

Plaintiff had manic episodes about twice per month, which could last hours or days. (Tr. 764-65). She said she  "crash[ed]" after, meaning "complete exhaustion or fatigue" and depression where she sometimes could not even get off the couch. (Tr. 765). When depressed, she did not shower, or take care of herself, but she did drive herself to the doctor. (Tr. 769). Plaintiff was hospitalized in 2015 for a suicide attempt; it was her fourth. (Tr. 768). She testified her psychological problems had gotten worse or "more prominent" with age. (Tr. 773).

Plaintiff estimated she could walk for five to ten minutes; she could not stand still for five minutes without having to "constantly move and adjust." (Tr. 766). She also had difficulty sitting, with pain "up [her] spine into [her] lower back where the disc is bulged"; she could not sit still for five minutes. (Tr. 767).

Relevant Medical Records

*Physical Health Records*

Plaintiff has a history of neck, shoulder, and back pain. A July 2007 cervical spine MRI showed "slight focal left paracentral eccentric disk bulge at C3-C4." (Tr. 327). December 2008 x-rays showed "mild to moderate degenerative changes" and "mild relatively diffuse degenerative changes." (Tr. 323-24). A March 2009 left shoulder MRI showed "[m]inimal findings with slight tendonitis." (Tr. 325).

An April 2011 cervical spine MRI showed a left lateral disc herniation which did not contact the cord, and moderate left neural foraminal stenosis secondary to the disc material. (Tr. 321). At the same time, a left shoulder MRI showed mild subacromial subdeltoid bursitis and mild supraspinatus tendinopathy with mild acromioclavicular arthrosis. (Tr. 322). A June 2012 EMG showed possible left C4-5 radiculitis. (Tr. 575).

A November 2012 cervical spine MRI showed "mild degenerative changes and mild C34 facet arthrosis" and "[m]ild left foraminal stenosis and cord compression." *See* Tr. 1540.

Plaintiff underwent physical therapy for neck/cervical pain at the direction of Paul Hanahan, M.D., in 2013. *See* Tr. 597-607. Dr. Hanahan also ordered a lumbar spine MRI, which showed "[d]egenerative disc disease at L5-S1", "[n]o evidence for definite root impingement", "[n]o evidence for vertebral body fracture." (Tr. 592). Dr. Hanahan reviewed Plaintiff's MRI and physical therapy treatment in May 2013; traction therapy helped her lower back symptoms, but she continued to have pain into the right leg. (Tr. 620). Her neck was "relatively stable". *Id.*

In June 2013, Plaintiff described neck pain going down her left arm and lower back pain going down her right leg. (Tr. 619). She also reported "difficulties walking greater than a half a mile to 1 mile" and an "inability to sit in one position for any extended period of time." *Id.*

5

In January 2015, Plaintiff saw Susan Stephens, M.D., at the Institute for Spine. (Tr. 1540-41). On examination, her biceps reflex was absent on the left and normal on the right, she had full strength. (Tr. 1540). X-rays showed normal findings in the left shoulder, and disc degeneration, facet hypertrophy, and arthritis in Plaintiff's cervical spine. *See* Tr. 1541.

In February 2015, Plaintiff saw Leonard Weinberger, M.D., for "neck pain to the left upper extremity for many years." (Tr. 1537). Plaintiff denied leg stiffness or weakness. *Id.* Plaintiff's spine was non-tender; she had normal muscle strength, tone, and bulk, and normal reflexes and sensation. (Tr. 1538-39). Her stance and gait were "unremarkable". (Tr. 1538). Dr. Weinberger described a "benign neurological exam" and ordered an EMG nerve study of the left upper extremity; Plaintiff was to consult with orthopedics regarding her left shoulder. (Tr. 1539).

In June 2015, Plaintiff saw Patrick Convery, M.D., for left knee pain. (Tr. 1527-28). Her back was non-tender and her straight leg raise test was negative, but she had tenderness in her left knee. (Tr. 1527). Plaintiff underwent a steroid injection. (Tr. 1528).

In July 2015, Dr. Hanahan noted "moderate tenderness", no muscle spasm, restricted neck and low back range of motion in, and moderately painful flexion and extension. (Tr. 1525). Dr. Hanahan refilled Plaintiff's Roxicodone prescription and instructed her to "[c]ontinue weight loss". *Id.*

In August, Plaintiff "continue[d] to lose weight by diet and exercise", but stated her neck and low back pain were "impeding her normal daily activities". (Tr. 1524). She had neck tenderness, restricted shoulder motion, reduced right hand grip strength, tenderness in her lower back, and a "relatively weak" leg lift bilaterally. *Id.* She also had "some pain" with flexion and extension of her back. *Id.* Dr. Hanahan repeated his instructions from the prior visit. *Id.*

At her September visit, Plaintiff reported continued neck pain, greater than her lower back pain. (Tr. 1523). On examination, she had moderate tenderness in her low back and restricted range of motion, but her "[l]eg lift [was] strong." *Id.* A handwritten note for a drug screen noted Plaintiff was negative for oxycodone and "3rd time negative for meds!!!" *Id.* Dr. Hanahan again instructed Plaintiff to follow-up in one month and refilled her Roxicodone prescription; he noted they "[d]iscussed reduction in pain medication for next month". *Id.*

At her next visit to Dr. Hanahan in November 2015, Plaintiff reported no changes, but continued back and neck pain; daily exercises helped reduce the pain. (Tr. 1522). On examination, she again had "[m]oderate tenderness" in her lower back muscles and neck, but no spasm; her back range of motion was "restricted at the extremes" and her leg lift was "weak bilaterally". *Id.* Dr. Hanahan reduced Plaintiff's pain medication. *Id.*

The next month, Plaintiff reported no changes, "feeling pretty good", doing home exercises on a regular basis, and using a treadmill. (Tr. 1520). Plaintiff had "mild tenderness" in her lower midline and left paralumbar muscles, and a "weaker" leg lift on the right. *Id.* She had "fair to good" range of motion in her neck "with tenderness at the extremes", and a slightly weaker right shoulder shrug. *Id.*

In January 2016, Plaintiff was "doing okay" with reduced narcotic medications and supplementing with Advil. (Tr. 1519). She again had tenderness in her lower back, restricted range of motion at the extremes, and a "relatively weak" leg lift bilaterally. *Id.* In February, findings were similar, but her leg lift was strong bilaterally. (Tr. 1518). She also had moderate tenderness in her neck and increased pain with flexion and extension. *Id.* Her grip strength was good in both hands. *Id.* At both visits, Dr. Hanahan reduced her pain medication. (Tr. 1518-19).

7

In April 2016, Plaintiff saw neurologist Gary Kutsikovich, M.D., for her neck pain. (Tr. 2084). On examination, she had full muscle strength and tone, as well as normal reflexes. *Id.* She had moderate tenderness in her left cervical paraspinal muscles and slightly reduced range of motion in her left shoulder. *Id.* Dr. Kutsikovich ordered imaging and prescribed a Medrol Dosepak. (Tr. 2092). The MRI showed left paramedian disc osteophyte complex at C3-4 causing "mild" left cord impingement and neural foramen narrowing, as well as "minimal" disc bulges at C2, C4, and C5. *Id.*

That same month, Plaintiff went to physical therapy for her knee pain. *See* Tr. 1753. In November 2016, Plaintiff underwent a left knee arthroscopy, *see* Tr. 2037, and again attended physical therapy thereafter, *see* Tr. 1973-88. In March 2017, Dr. Convery noted Plaintiff initially had improvement, but then re-aggravated her knee pain. (Tr. 2037). On examination, Plaintiff's back was nontender, and her straight leg raise was negative bilaterally. (Tr. 2038). Plaintiff's knee was tender and she had pain with range of motion. *Id.* Dr. Convery provided an injection, and advised continued use of a knee brace, ice, exercises, and Tylenol. (Tr. 2038-39).

*Physical Health Opinion Evidence*

In June 2012, state agency physician William Bolz, M.D., reviewed Plaintiff's medical records. (Tr. 116-19, 121-22). He concluded Plaintiff could lift twenty pounds occasionally and ten pounds frequently. (Tr. 117). She could stand and/or walk about six hours in an eight-hour workday, and sit for six hours. *Id.* She could frequently push/pull and occasionally reach overhead with her left upper extremity. (Tr. 117-18). Dr. Bolz found Plaintiff had postural limitations based on her cervical degenerative disc disease that would limit her to frequent climbing of ramps or stairs; occasional climbing of ladders, ropes, or scaffolds; frequent stooping, kneeling or crouching; and occasional crawling. *Id.*

In October 2012, state agency physician Lynne Torello, M.D., reviewed the record and reached the same conclusions as Dr. Bolz. (Tr. 132-34).

In June 2013, Dr. Hanahan filled out a form opining Plaintiff could: lift ten pounds on average, five pounds frequently, and fifteen pounds occasionally; stand and/or walk for a total of two hours in an eight-hour workday (fifteen minutes without interruption); sit for three hours in an eight-hour workday (thirty minutes without interruption). (Tr. 614). In support, Dr. Hanahan cited "neck and low back pain, MRI findings." *Id*. He opined Plaintiff could never climb, balance, stoop, crouch, kneel, or crawl. *Id*. He wrote Plaintiff's ability to reach, handle, feel and push/pull were affected by her neck and back pain, citing weakness in her left arm and restricted range of motion in her lower back. *Id*. Plaintiff could have no exposure to heights, moving machinery, temperature extremes, pulmonary irritants, or vibration because they would "cause more pain." *Id*. Dr. Hanahan further believed Plaintiff would be off task 25 percent or more of the workday, and absent three days per month. *Id.*

In March 2016, Dr. Hanahan completed a second opinion statement form, opining Plaintiff could lift less than ten pounds, citing cervical and lumbar disc disease. (Tr. 1623). He did not answer questions indicating the maximum amount Plaintiff could lift occasionally or frequently. *See id.* He opined Plaintiff could stand and/or walk for two hours total in a workday (thirty minutes without interruption), and sit less than two hours total in a workday (thirty minutes without interruption), citing "back spasms". *Id.* He indicated Plaintiff could never perform any postural activities, but left blank a question requesting "the medical findings that support this assessment". *Id.* He indicated Plaintiff would be absent more than four days per month and be off task fifteen percent of a workday due to pain or fatigue. (Tr. 1624). He further opined Plaintiff would need to lie down every thirty minutes if working a sedentary job, and

9

need one unscheduled break outside of normal break periods. *Id.* Dr. Hanahan wrote "MRI of cervical + lumbar spine" as the medical basis for his opinions. *Id.*

In April and May 2016, respectively, state agency physicians Esberdado Villanueva, M.D., and Abraham Mikalov, M.D., reviewed Plaintiff's records and concluded she could perform a range of medium exertional work. *See* Tr. 966-68, 983-85.

*Mental Health Records*

During the relevant time period, Plaintiff received mental health treatment at Signature Health. In June 2010, Plaintiff underwent an initial psychiatric evaluation after a hospitalization for suicidal ideation. (Tr. 502-05). Robin Krause, RN, CNS, APRN, diagnosed Plaintiff with Bipolar I disorder and assigned her a Global Assessment of Functioning ("GAF") score of 45-50, indicating serious symptoms.[2] (Tr. 504). Plaintiff continued to treat with Ms. Krause through November 2010. (Tr. 506-13).

On August 4, 2011, Plaintiff said she had a "mental break" during a period of incarceration because she did not receive her medications. (Tr. 413). Four days later, Plaintiff was admitted to the hospital after expressing suicidal thought. (Tr. 420). She was delusional and "possibly having hallucinations." (Tr. 431).

Plaintiff returned to Ms. Krause in August and September 2011. (Tr. 514-15, 525-26). In August, Plaintiff was "very anxious" and "mildly disheveled" but her speech was coherent. (Tr.

---

2. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM–IV–TR*). A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)" *Id.* at 34.

514). She reported hearing sounds and seeing shadows. *Id.* Ms. Krause continued to adjust Plaintiff's medications. (Tr. 514, 525-26).

Plaintiff continued to treat with Ms. Krause in 2012 and 2013, reporting various symptoms such as anxiety, depression, decreased appetite, hallucinations (seeing shadows and hearing voices), and difficulty sleeping. *See* Tr. 523, 555, 576, 596, 618. Ms. Krause adjusted her medications. *See* Tr. 523, 555, 576, 594, 618. In June 2012, Plaintiff was looking for work and applying for jobs. (Tr. 555). In October, Plaintiff refused counseling and Ms. Krause assessed Plaintiff with a GAF score of 55[3]. (Tr. 576). In April 2013, Plaintiff told Ms. Krause she was "doing well" and her mood was stable. (Tr. 596). Ms. Krause assessed GAF scores of 55 in June 2013 (Tr. 594) and 60 in October 2013 (Tr. 1503).

Plaintiff continued her mental health treatment at Signature Health in 2014, seeing Ms. Krause. *See* Tr. 1460-99. During this time, Plaintiff continued to report symptoms of anxiety and depression, along with hallucinations (hearing voices and seeing shadows); Ms. Krause continued to adjust Plaintiff's medications and assign a GAF score of 55. *See id.*

Plaintiff returned to treat at Signature Health in February 2015, seeing nurse practitioner Bernard Nosanchuk for most of the year. (Tr. 1452-59). Plaintiff described auditory and visual distortions, and flashbacks to prior abuse. (Tr. 1455). During much of 2015, Mr. Nosanchuk adjusted Plaintiff's medications and noted Plaintiff declined counseling; he assigned a GAF score of 55. *See* Tr. 1399-1459. She continued to report symptoms of anxiety and depression, as well as hallucinations. *See id.* In October, Plaintiff expressed interest in counseling. (Tr. 1408).

---

3. A GAF score of 51–60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers)". *DSM–IV–TR* at 34.

In November 2015, Plaintiff began seeing psychiatrist Thomas Svete, M.D., at Signature Health. (Tr. 1398-99). Plaintiff reported her mood swings had worsened over time, but she had learned to manage them better. (Tr. 1398). She described manic and depressive episodes. *Id.* Dr. Svete diagnosed bipolar disorder and adjusted Plaintiff's medications. *Id.*

Plaintiff continued to see Dr. Svete in 2016. In January, he noted Plaintiff's diagnoses (bipolar disorder and PTSD) and medications. (Tr. 1379). Plaintiff reported anxiety and panic attacks four to five times per week. *Id.* She was raising her four-year-old grandson. *Id.* Dr. Svete adjusted Plaintiff's medications, instructed her to limit her caffeine, counseled her on the importance of exercise, and noted a counseling request was pending. (Tr. 1380). In February, Plaintiff described mood swings, depression, panic attacks, and auditory hallucinations. (Tr. 1806). She saw shadows, but "question[ed] if it's her cat". *Id.* Dr. Svete noted "[a]t this point she seems to be functioning relatively well" and "seems to be making good decisions", but "she continues to have occasional command hallucinations which are self deprecatory". *Id.*

Plaintiff reported "a 3 week depression" in March 2016; Dr. Svete adjusted her medications and recommended counseling. (Tr. 1798). In May, Plaintiff was "functioning better" off Latuda. (Tr. 1783). In June, she was feeling pretty good "in general", though her life was "full of stress". (Tr. 1776). In July, Plaintiff was more active, more productive, and had a more consistent schedule. (Tr. 1768). In August, Plaintiff reported she "does well" with Lamictal, but complained of memory difficulty. (Tr. 1761). Throughout this time, Dr. Svete continued to adjust Plaintiff's medications. (Tr. 1760-61, 1790).

Plaintiff continued to treat with Dr. Svete in 2017. In April, Plaintiff reported feeling depressed and like she was "just surviving". (Tr. 2011). In May, Plaintiff told Dr. Svete she was "in a level zone[,] not happy or sad just going thru [sic] motions". (Tr. 1998). She described

herself as "so extremely busy" with doctor's appointments. *Id.* Dr. Svete opined Plaintiff's depressive symptoms were "secondary to her chronic depression and developmental issues such as past trauma and some self-defeating personality traits" and encouraged therapy. *Id.* Plaintiff had monthly visits in June, July, and August, and October 2017, reporting continued symptoms. (Tr. 2052, 2071, 2157-58). In November 2017, Dr. Svete noted Plaintiff was "overall . . . doing reasonably well given her history of chronic depression". Again, Dr. Svete continued to adjust Plaintiff's medications. (Tr. 1998, 2011, 2052, 2071, 2144, 2157-58).

Plaintiff continued to treat with Dr. Svete in 2018. In March, she complained of increased anxiety and panic attacks. (Tr. 2130). In April, she was "doing much better for the past two weeks" and was "much more stable". (Tr. 2123). In May she was "miserable and anxious". (Tr. 2116). In June, Plaintiff reported increased anxiety and daily panic attacks. (Tr. 2109). In August, she was "doing good", and feeling her depression was "more stable despite the stress." (Tr. 2103). Throughout, Dr. Svete continued and adjusted Plaintiff's medications. *See* Tr. 2130-31, 2123-24, 2116-17, 2109.

*Mental Health Opinion Evidence*

In September 2011, Carl Tischler, Ph.D., provided an opinion on behalf of the state agency regarding Plaintiff's mental limitations. (Tr. 87-92, 95-96). He concluded Plaintiff would be moderately limited in her ability to carry out detailed instructions, but not significantly limited in the ability to carry out very short and simple instructions. (Tr. 95). He opined she was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. *Id.* He further concluded she would be moderately limited in her ability to interact appropriately with the general public, to accept

13

instructions and respond appropriately to criticism from supervisors, and to respond to changes in the work setting. (Tr. 95-96).

In June 2012, Jennifer Swain, Psy.D., examined Plaintiff's mental health records on behalf of the state agency. (Tr. 103, 107-08). She concluded Plaintiff was "capable of completing tasks which are relatively static in nature and do not require a fast work pace", but that Plaintiff was limited due to her depressive symptoms which "may interference with maintaining concentration." (Tr. 107). She further opined Plaintiff was "capable of completing tasks that do not require a high level of supervision" and "capable of completing tasks in which changes are infrequent and can be explained", noting Plaintiff was limited by her depressive symptoms and low frustration tolerance. (Tr. 107-08).

In September 2012, Dr. Roseann Umana, Ph.D., examined Plaintiff's records on behalf of the state agency and agreed with the previous assessment. (Tr. 129-130, 134-35).

In November 2012, Ms. Krause completed a "Medical Source Assessment (Mental)." (Tr. 590-91). She concluded Plaintiff would have difficulty with most types of work-related activities for 11-20 percent of the workday or more than 20 percent of the workday. Id. She also opined Plaintiff would miss work approximately four days per month. (Tr. 591). In June 2013, Ms. Krause completed a second "Medical Source Assessment (Mental)", with similar, but slightly different answers than her November 2012 assessment. (Tr. 616-17).

In March 2016, Dr. Svete completed a "Medical Source Assessment (Mental)". (Tr. 1620-21). Therein, he indicated Plaintiff would have difficulty more than 20 percent of the workday *inter alia*, understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration; performing activities within a schedule; working in coordination with or proximity to others; accepting instructions and responding appropriately to

criticism from supervisors; completing a normal workday and workweek without interruptions from psychologically based symptoms; and performing at a consistent pace. (Tr. 1620-21). Next to some of these limitations, he wrote "trouble maintaining train of thought", "gets confused" and "panics in groups". (Tr. 1620). He further noted Plaintiff would have difficulty 11-20 percent of the workday in her ability to interact with the general public; set goals and make independent plans; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness (noting "trouble showering and [with] hygiene when depressed.") (Tr. 1620-21). He further indicated Plaintiff would miss about four days of work per month, be off task 15 percent of a workday, and require one unscheduled ten-minute break per day. (Tr. 1621).

In April 2017, Dr. Svete completed a second "Medical Source Assessment (Mental). (Tr. 1989-91). Therein, he opined Plaintiff could not perform activities within a schedule or complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 1989). Plaintiff would have difficulty more than 20 percent of the workday maintaining attention and concentration. *Id.* He further noted Plaintiff would have difficulty 11-20 percent of the workday in her ability to understand, remember, and carry out detailed instructions; get along with coworkers or peers; be aware of normal hazards and take appropriate precautions; and set goals and make independent plans. (Tr. 1989-90). As to the remainder of the questions, he indicated Plaintiff was either not limited, or would have difficulty less than ten percent of the day. *Id.* He did not answer the question about medical findings to support his opinions. *See* Tr. 1990. He further indicated Plaintiff would miss more than four days of work per month, be off task over 20 percent of a workday due to mental health symptoms, and need more than four 30-60 minute unscheduled breaks per day. *Id.*

15

<u>VE Testimony</u>

A VE testified at the July 2017 hearing before the ALJ. (Tr. 786-802). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. *See* Tr. 790-92. The VE responded that such an individual could perform Plaintiff's past work as a cashier as she performed it and could perform other jobs such as hand packager, electronics assembler, and hand gluer. (Tr. 792). The VE further testified that an individual limited to occasional left-handed handling and fingering, or who was off task at least fifteen percent of the time, or missed three days of work per month, would not be able to perform Plaintiff's past work or other work. (Tr. 794-96). Similarly, if a person could not work with others and would have a difficult time accepting criticism from supervisors, no work would be available. (Tr. 796-97). However, if the individual were limited to frequent interaction with coworkers, supervisors, and the public, the same jobs the VE previously identified would be available. (Tr. 800).

<u>ALJ Decision</u>

In his December 2018 written decision, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through June 30, 2016, and had not engaged in substantial gainful activity since her alleged onset date (February 28, 2011). (Tr. 636). He found Plaintiff had severe impairments of asthma/chronic obstructive pulmonary disease, cervical degenerative disc disease with radiculopathy, lumbar degenerative sic disease, status post left knee arthroscopy, bipolar disorder, and post-traumatic stress disorder. *Id.* However, the ALJ concluded none of these impairments – singly or in combination – met or medically equaled a listed impairment. *Id.* He then set forth Plaintiff's RFC:

> [T]he claimant has the [RFC] to perform light work, as defined in 20 CFR 404.1657(b) and 416.967(b), except she should be afforded the opportunity to

16

alternate positions between standing and sitting at approximately 30-minute intervals; she is limited to frequent push pulling with the left upper extremity; she can never climb ladders, ropes or scaffolds, and crawl; she can frequently climb ramps or stairs, stoop, kneel and crouch; she is limited to occasional overhead reaching with the left upper extremity; she is limited to frequent handling and fingering with the left upper extremity; she should avoid concentrated exposure to fumes, odors, dust, gases and other pulmonary irritants; and she should avoid concentrated exposure to hazards, such as dangerous machinery and unprotected heights. Claimant is further limited to simple, routine tasks with no fast-paced work, no strict production quotas, and no more than minimal or infrequent changes in the work setting.

(Tr. 638).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

4. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff raises three objections to the ALJ's decision. First, she contends the ALJ failed to comply with this Court's remand order and again violated the treating physician rule as to Dr.

18

Hanahan's opinion. Second, she contends the ALJ violated the treating physician rule as to Dr. Svete's opinions. Finally (and relatedly), she argues the ALJ erred in finding she could perform her prior work because the ALJ's RFC did not include the limitations opined by Drs. Hanahan and Svete. For the reasons discussed below, the undersigned recommends the Court affirm as to Dr. Hanahan's opinion, but reverse and remand as to Dr. Svete's opinions.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188.[4] "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id.* A failure to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243. Accordingly, failure to give good reasons requires remand. *Wilson*, 378 F. 3d at 544. The purpose of the rule is two-fold: first, it " 'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician

---

4. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Soc. Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Wilson*, 378 F.3d at 544 *(*quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)); second, it ensures "meaningful appellate review". *Id.*

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96–2p, 1996 WL 374188, at *4). "If the ALJ does not accord the opinion of the treating source controlling weight, it must apply certain factors" to assign weight to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*; *see also Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2011) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible with other evidence of record: there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.").

Dr. Hanahan

This Court previously remanded for the ALJ to re-explain his consideration of Dr. Hanahan's opinion. Tr. 863-88. This was because the ALJ stated Dr. Hanahan's opinion was inconsistent with his own records, but erroneously cited records from a different physician. (Tr. 881-82). The undersigned finds Plaintiff's current objection not well-taken as the ALJ this time

20

provided supported "good reasons" for discounting Dr. Hanahan's opinions. Therefore, the undersigned recommends the Court affirm the ALJ's determination in this regard.

On remand, after an additional hearing, the ALJ addressed Dr. Hanahan's opinions:

> Limited weight is also given to the medical source statement completed by Paul Hanahan, M.D., dated June 24, 2013. He concluded that the claimant can lift and carry up to 15 pounds occasionally and five pounds frequently, stand and walk for two hours in an eight hour day, sit for three hours in an eight hour day, never climb, balance, stoop, crouch, kneel and crawl, would be absent about three days a month and be off task 25% of a typical workday but such findings appear to be based on the claimant's subjective complaints and are inconsistent with the claimant's findings on physical examination, which show normal reflexes, normal sensation and normal muscle strength. They are also inconsistent with radiographic studies, which demonstrate mild findings (Exhibit 19F, pp. 1-2; see Exhibits 25F, pp. 22-24; 26F, p. 64). Similarly, limited weight is given to the medical source statement that Dr. Hanahan completed on March 10, 2016. The benign objective evidence in the record does not support such extreme limitations (Exhibit 27F, pp. 4-5).

(Tr. 641).

This analysis provides substantially supported "good reasons" for discounting Dr. Hanahan's opinion. Dr. Hanahan's opinions differ from the RFC in that they offers more limiting lifting, carrying, standing, walking, sitting, and postural restrictions, as well as off task and absenteeism limitations. *Compare* Tr. 638 *with* Tr. 614-15, 1623-24. Plaintiff does not specify which restriction or restrictions she alleges the ALJ should have adopted in the RFC, but argues more generally the ALJ's reasons for discounting Dr. Hanahan's opinion are not supported. The undersigned disagrees.

First, the ALJ said Dr. Hanahan's June 2013 opinion "appear[ed] to be based on [Plaintiff's] subjective complaints". (Tr. 641). If a treating physician's opinion appears to be based solely on a claimant's subjective complaints, rather than objective evidence, this can be a "good reason" to discount a treating physician opinion. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876–77 (6th Cir. 2007). The ALJ in this case, however, used this statement to lead into

21

his explanation that he found the objective evidence did not support the "extreme" level of restrictions opined by Dr. Hanahan.[5] That analysis is supported as set forth below.

The ALJ next said Dr. Hanahan's opinion was inconsistent with specific physical findings on examination – "normal reflexes, normal sensation and normal muscle strength." (Tr. 641). Two pages prior, the ALJ summarized some of these findings: "Physical examinations have noted tenderness and restricted range of motion of the cervical spine but normal reflexes, normal sensation and normal muscle strength." (Tr. 639). He cited Dr. Hanahan's records from March and November 2015 (showing neck and back tenderness) (Tr. 1522, 1532), Dr. Weinberger's findings from February 2015 (showing normal reflexes, strength, and sensation) (Tr. 1538-39), and a January 2015 finding of full motor strength (Tr. 1540). Such normal, or less extreme findings are also supported elsewhere in the record. *See* Tr. 2084 (Dr. Kutsikovich's April 2016 finding of full muscle strength and normal reflexes); Tr. 1527 (Dr. Convery's finding that Plaintiff's back was non-tender and her straight leg raise test was negative).

Plaintiff, for her part, points to other positive findings in the record, including reduced left grip strength, muscular tenderness, reduced range of shoulder motion, decreased sensation in the left arm, reduced leg lift, and positive Tinel's sign. *See* Doc. 16-1, at 18 (citing records). But she fails to show how these demonstrate the ALJ's rationale for discounting Dr. Hanahan's opinion is not supported. Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. The ALJ here cited inconsistencies in the record, which is a good reason to discount an opinion. *See* 20 C.F.R. §

---

5. Plaintiff objects to the Commissioner's use of the term "extreme" in his brief, stating that it "was a term not used by the ALJ." (Doc. 20, at 1). However, the ALJ used precisely that term, both in reference to Dr. Hanahan's opinion (*see* Tr. 641) and to Dr. Svete's opinion (*see* Tr. 642).

404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.").

Third, the ALJ noted Dr. Hanahan's opinion was inconsistent "with radiographic studies, which demonstrate mild findings." (Tr. 641). In support, he cited Dr. Weinberger's review of a November 2012 cervical MRI which "show[ed] mild left foraminal narrowing at C3-4" and "[n]o significant canal stenosis or cord compression" (Tr. 1539) and Plaintiff's May 2013 lumbar spine MRI, which showed degenerative disc disease and "[n]o evidence for definite nerve root impingement" (Tr. 1618). The lumbar MRI further showed some facet hypertrophy, "[m]ild bilateral neuroforaminal narrowing at L4-5, and "[m]ild to moderate" left-sided neuroforaminal narrowing." (Tr. 1618). And Dr. Stephens summarized the November 2012 MRI as showing [f]indings consistent with mild degenerative changes and mild C34 facet arthrosis" as well as "[m]ild left foraminal stenosis and cord compression." (Tr. 1540). Plaintiff seemingly argues this was not a good reason, stating, "there were MRI tests of the cervical spine (Tr. 321 and 2089), left shoulder (Tr. 322), and lumbar spine (Tr. 592)." (Doc. 16-1, at 18). She contends, thus, "Dr. Hanahan had both objective testing and his examinations supporting his assessments". *Id.* But Plaintiff fails to show the ALJ's finding – that the examination findings and imaging evidence did not fully support Dr. Hanahan's opinion – is unsupported.

Earlier in his opinion, the ALJ cited the imaging findings, summarizing that they "have demonstrated findings that have been described as minimal to mild to moderate" in reasoning that he found Plaintiff's allegations of disabling pain not fully supported. *See* Tr. 639. The lumbar spine MRI Plaintiff cites is the same lumbar spine MRI the ALJ cited. *See* Tr. 592, 1618 (duplicate copies). Moreover, the ALJ cited one cervical spine MRI earlier in his opinion. *See* Tr. 639 ("She underwent a cervical spine MRI on April 18, 2011, which demonstrated left lateral

disc herniation at the C3-4 level") (citing Tr. 321). The second cervical spine MRI cited by Plaintiff, from July 2017, showed "mild reversed lordosis, "[m]ild" or "[m]inimal" disc bulging at C2-3, C4, and C5, and "[a]t C3-4 there is "central and left paramedian disc osteophyte complex causing very slight left anterior cord impingement and left neural foramen narrowing" at C3-4. (Tr. 2089, 2092). It was reasonable for the ALJ to find these radiographic studies inconsistent with the more extreme limitations opined by Dr. Hanahan, such as that Plaintiff could only stand for two hours (fifteen to thirty minutes at a time), sit for two to three hours (thirty minutes at a time), never perform any postural activities, and be off task fifteen to twenty-five percent of the day due to pain or fatigue.

Fourth, and finally, the ALJ, in discounting Dr. Hanahan's later (March 2016) opinion, wrote: [t]he benign objective evidence in the record does not support such extreme limitations." (Tr. 641). Although the ALJ did not provide evidentiary support in this sentence, in the prior sentence, he stated he was "[s]imilarly" giving limited weight to this opinion, suggesting that it was for the same reasons for the similar June 2013 opinion discussed just prior. (Tr. 641). As stated above, these reasons are supported. Although the ALJ's choice of the word "benign" was perhaps inartful, it is clear from the context that he meant the record as a whole – and those record he reference previously -- showed Plaintiff was less limited than Dr. Hanahan found.

Taken in its entirety, the ALJ's explanation directly addressed the rationale Dr. Hanahan cited for his opinion – that it was based on Plaintiff's "neck and low back pain" and "MRI findings" (Tr. 614); *see also* Tr. 1623-24 ("cervical/lumbar disc disease", "back spasms", and "MRI of cervical + lumbar spine"). The ALJ found these reasons did not support the level of restriction opined, which as set forth above, is supported by the record. As such, the undersigned finds the ALJ provided "good reasons" to discount Dr. Hanahan's more restrictive opinions, that

is, reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96–2p, 1996 WL 374188, at *4.

Dr. Svete

Plaintiff next contends the ALJ violated the treating physician rule as to Dr. Svete's opinion. She argues the ALJ provided no record support for his statements that Dr. Svete's March 2016 opinion was inconsistent with the treatment record, "failed to refer to any of the numerous records documenting Dr. Svete and Signature Health's treatment of Plaintiff", and "committed harmful and reversible error when he discounted [Dr. Svete's opinion], ignored the notes documenting her problems, and failed to provide any support for his conclusion." (Doc. 16-1, at 17-18). The Commissioner responds that the ALJ referenced specific records earlier in his opinion, inconsistency is a good reason to discount a treating physician's opinion, and Plaintiff "does not dispute these inconsistencies, and thereby conceded the argument." (Doc. 19, at 7). For the reasons discussed below, the undersigned finds Plaintiff's objection well-taken and recommends the Court reverse and remand for re-evaluation of Dr. Svete's opinions.

The ALJ addressed Dr. Svete's two opinions as follows:

Limited weight is further given to the medical source statement completed by Thomas Svete, M.D., dated March 8, 2016. He concluded that the claimant would be unable to understand, remember and carry out instructions; maintain attention and concentration; perform activities within a schedule; and complete a normal workday and workweek more than 20% of a workday or work week. He also found that the claimant would be off task 15% of the day, need an unscheduled break one time a day, and be absent about four days per month. However, such findings are inconsistent with treatment records from Signature Health, which have consistently noted that the claimant has a GAF of 55-60 or moderate limitations (Exhibit 27F, pp. 1-3). Limited weight is also given to medical source statement completed by Dr. Svete dated April 3, 2017. In that statement, he indicated that the claimant would be off task 20% of the day, need unscheduled breaks more than four times a day, and would absent more than four days a month but the claimant's treatment records do not support such extreme limitations.

25

> Furthermore, the statement is internally inconsistent because he found that the claimant was able to do most work- related activities with no limitations or is limited only up to 10% of the workday. In addition, it is inconsistent with the statement that he completed one year before on March 8, 2016 as it is more restrictive in some areas but less restrictive in other areas (Exhibit 34F).

(Tr. 641-42).

Thus, the only reason the ALJ provided for giving "limited weight" to Dr. Svete's March 2016 opinion is inconsistency with GAF scores and, as Plaintiff correctly points out, the ALJ did not provide a citation to anything other than Dr. Svete's opinion after this statement. *See* Tr. 642 (citing only Tr. 1621-23). Moreover, the Sixth Circuit has noted a GAF score "may have little to no bearing on the subject's social and occupational functioning", *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006), and that a GAF score is somewhat superficial:

> GAF is a clinician's subjective rating of an individual's overall psychological functioning. A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning.

*Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 (6th Cir. 2006)). And, as another district court persuasively explained, discounting a treating physician's opinion solely based on the ALJ's interpretation that it is contrary to a GAF score is illogical:

> As the ALJ correctly stated, according to the DSM–IV, "a GAF between 51 and 60 represents moderate symptoms or moderate difficulty in social, occupational or school functioning." (AR 22.) Thus, according to the ALJ, Dr. Chang's documentation of "marked" limitations was inconsistent with the "moderate" degree of limitation correlating with Plaintiff's GAF scores of 55 and 60. (*Id.*) However, the ALJ failed to explain why a GAF score superseded Dr. Chang's more precise opinions. By the ALJ's logic, Dr. Chang's functional assessment was unnecessary because Plaintiff's GAF score conclusively determined that her limitations were "moderate." . . . Essentially, the ALJ used unqualified data, provided by the professional as a macroscopic evaluation, to disprove the professional's more detailed, expert functional assessment.

*Smith v. Astrue*, 565 F. Supp. 2d 918, 924–25 (M.D. Tenn. 2008); *see also Lowe v. Comm'r of Soc. Sec.*, 2015 WL 868059, at *7 (N.D. Ohio) ("GAF scores are fluid, so that any particular past score does not necessarily have any direct relevance to current levels of functioning. Thus, a citation to a past score, without more, does not state a "good reason" why a current opinion is unsupported by the treatment record or is in any way inconsistent with any past opinions of the medical source."). The ALJ here provided no further rationale for discounting Dr. Svete's March 2016 opinion other than to say it was "inconsistent with the treatment records". (Tr. 641). This is insufficient. "[I]t is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record: there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Friend*, 375 F. App'x at 551. Without some explanation as to how the records are inconsistent the Court cannot meaningfully review such an assertion. The ALJ failed to provide such an explanation here. And even if the undersigned were to look to the ALJ's previous citations to GAF scores in the record (Tr. 640 (citing Tr. 594, 618, 1366, 1476, 1494, 1503, 1505)[6]), such GAF scores "alone, cannot discredit [Dr. Svete's] assessment of Plaintiff's limitations." *Smith*, 565 F. Supp. 2d at 925.

The ALJ's reasons for discounting Dr. Svete's April 2017 opinion are also flawed. First, the ALJ said, generally, that "the claimant's treatment records do not support such extreme limitations." (Tr. 642). As Plaintiff points out, the ALJ cited nothing after this statement. Again, the treating physician rule requires "some effort to identify the specific discrepancies". *Friend*, 375 F. App'x at 551. "Thus while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the

---

6. These GAF scores were assigned by Ms. Krause and Mr. Nosanchuk from 2013-15.

criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Id.*

Second, the ALJ said Dr. Svete's April 2017 statement was "internally inconsistent because he found that the claimant was able to do most work-related activities with no limitations or is limited only up to 10% of the workday." (Tr. 642). However, it is unclear to the undersigned – without additional explanation – how this is an inconsistency. Although the ALJ is correct that Dr. Svete opined Plaintiff had no, or minimal, limitations in certain areas, he also opined Plaintiff could not perform activities within a schedule or complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and would have difficulty 11-20  percent of the workday in getting along with coworkers or peers. *See* Tr. 1989. An individual could be less limited in some areas, and yet still have difficulties in others. Performing a job often involves doing multiple things at the same time (following instructions, concentrating, working alongside others). The basis for the "inconsistency" identified by the ALJ is thus unclear to the undersigned, preluding meaningful appellate review of whether this is a good reason to discount Dr. Svete's opinion.

Third, the ALJ said the statement was "inconsistent with the statement that he completed one year before on March 8, 2016 as it is more restrictive in some areas but less restrictive in other areas". (Tr. 642). But again, the ALJ did not make clear how the inconsistency between the two opinions means the second should be discounted. It is true that an ALJ may discount an opinion when it contradicts an earlier opinion without explanation. *See Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118 (6th Cir. 1994). But the ALJ here did not say it was different without explanation, only that it was different. Moreover, the ALJ did not, in his analysis of Dr.

Svete's opinion, cite any of Dr. Svete's treatment records (or, indeed, any other record evidence), such that the Court could infer that he found it differed without explanation. *See* Tr. 641-42.[7]

The Commissioner's general statement that inconsistency is a good reason to discount an opinion is certainly correct in the abstract. But the treating physician rule requires an explanation of the basis for that inconsistency, and "some effort to identify the specific discrepancies". *Friend*, 375 F. App'x at 551; *see also Wilson*, 378 F.3d at 544–46 (not harmless error for ALJ to fail to make sufficiently clear why he rejected treating physician opinion, even if substantial evidence not mentioned by the ALJ may have existed to support the decision to reject the opinion). There may well be good reasons, supported by the record for the ALJ to discount, or even reject Dr. Svete's opinion. But he did not provide them here. As such, remand is required.

Step Four

Finally, Plaintiff contends the ALJ erred at Step Four by failing to include the restrictions identified by her treating physicians in the RFC analysis. As discussed above, the ALJ did not err in his analysis of Dr. Hanahan's opinions, therefore there was no error in the ALJ's failure to include Dr. Hanahan's restrictions in the RFC. However, the ALJ did err in his consideration of Dr. Svete's opinions. Because remand is necessary for the ALJ to reevaluate those opinions, the undersigned does not reach the Step Four argument regarding Dr. Svete's restrictions at this time.

CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned recommends the Court find the Commissioner's decision denying DIB and SSI is

---

7. Earlier in his analysis of the medical evidence at Step Four, the ALJ cited one of Dr. Svete's records. *See* Tr. 640. He cited a February 2016 record indicating that Plaintiff "was functioning really well". (Tr. 1806). But he did not connect this statement in any way to his analysis of Dr. Svete's opinion.

not supported by substantial evidence, and therefore recommends it be reversed and remanded pursuant to Sentence Four of 42 U.S.C. § 405(g) for further consideration of Dr. Svete's opinion.


         s/ James R. Knepp II
         United States Magistrate Judge


*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).